# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALLIED PAINTING<br>& DECORATING, INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>INTERNATIONAL PAINTERS AND<br>ALLIED TRADES INDUSTRY<br>PENSION FUND,<br><br>*Defendants*. | Civil Action No. 3:21-cv-13310<br><br>**MEMORANDUM<br>AND ORDER** |

This matter is an appeal from an arbitration award in the amount of $427,195.00 in favor of Defendant International Painters and Allied Trades Industry Pension Fund ("the Fund") and against Plaintiff Allied Painting & Decorating, Inc. ("Allied"). Both parties brought dispositive motions wherein the Fund seeks to confirm the award (ECF No. 31) and Allied seeks to vacate the award (ECF No. 34). *See*, *PG Publishing, Inc. v. Newspapers Guild of Pittsburgh*, 19 F.4th 308, 312-314 (3d. Cir. 2021). Procedurally the motions are more appropriately read as cross motions to confirm or vacate the award. The Court has jurisdiction under 29 U.S.C. §§ 1401(b)(2) and 1451(c). Venue is proper under 29 U.S.C. § 1451(d) as the Fund conducts its operations in the District of New Jersey.

In this case, there is one issue – whether withdrawal liability is barred by laches after an approximate 10-year delay between the resumption of work after withdrawal by Allied, and the time of notification by the Fund to Allied that it is subject to withdrawal liability. Specifically, the Fund's demand letter was sent twelve years after Allied's obligation to contribute to the pension fund allegedly ended in 2005; and in calculating five years pursuant to the construction industry exception, seven years after which the Fund could have determined if Allied had made a complete withdrawal by resuming covered work in the jurisdiction. In very broad terms, the arbitrator found there was a very prolonged unreasonable delay by the Fund of its notification of withdrawal liability to Allied; but since Allied showed no prejudice, its laches objection was denied. (Decision on Employer's Motion for Calculation of the Award ("Opinion 5" at p. 30))[1].

---

[1]    The Arbitrator filed six opinions in deciding this case (ECF No. 5, p. 27 - 69).  Only four are cited, as follows:

*    Opinion and Partial Award dated August 24, 2019, p. 58 - 69 (referred herein as Opinion 1).

*    Opinion and Partial Award and Revised November 25, 2019, p. 44 - 56 (referred to herein as Opinion 2).

*    Decision on Employer's Request for Reconsideration dated November 25, 2019, p. 40 – 42 (referred to herein as Opinion 3).

*    Second Decision on Employer's Request for Reconsideration dated January 26, 2020, p. 33 – 38 (referred to herein as Opinion 4).

*    Decision on Employer's Motion for Clarification of Award dated November 25, 2020, p. 30 - 31 (referred to herein as Opinion 5).

I.

There are certain undisputed facts.

The Fund identified the date of Allied's withdrawal from its obligation to the Fund as July 31, 2005, on or prior to the expiration of the alleged CBA in April 2006. (ECF 36, Allied SOMF at ¶ 2(b)).

Allied conceded before the Arbitrator that it was clear on its website that it had been performing work in New Jersey throughout the alleged withdrawal period (2005-2010). (ECF No. 5 at 67); *see also* (ECF No. 33-5 at 15); (ECF No. 38-35 at T:350-1 to 351-23). Significantly, Robert Smith (owner of Allied) testified as follows:

> A.     (Robert Smith): . . .  Because we were performing painting work in New Jersey on hospitality jobs. So the ACM website referred to some of those previous projects. There are also other projects, later, post-2005, '06, '07, sometime in that period, that were strictly Allied Construction renovation projects, where there were painting components to them, to the contracts.
>
> Q.     (Mr. Begg, attorney for Allied). So what were those jobs in New Jersey, timeframe-wise? And if you need to look at the document, that's fine. I can show it to you.
>
> A.      Yeah, I mean, generally 2007, 2008, somewhere in that timeframe. One project in particular that I've been reminded of that we did was a Hilton Hampton Inn in Parsippany, New Jersey, significant renovation that had painting and wall coverings in it.
>
> Q.     How about the Flamingo Hotel in Atlantic City?

> A.    That was later, probably 2010-ish. Sometime
> around that period.

(ECF No. 38-35 at Tr..350:1-24)

Allied appeared on the Fund's October 2011 inactive list, thus noticing the

Fund staff that Allied was subject to withdrawal liability. (ECF 36, Allied SOMF

at ¶28).

On July 20, 2017, the Fund notified Allied of its obligation to pay over

$400,000 in withdrawal liability (relying upon a Withdrawal Liability Worksheet

noting that Allied defaulted on July 31, 2005).

On October 9, 2017, Allied requested review of the Fund's demand. (ECF

36, Allied SOMF at ¶ 52). The Fund conducted a review and declined to withdraw

its statement of liability by letter dated February 1, 2018. (ECF No. 43, Fund

Response to SOMF at ¶ 53). Allied timely requested arbitration on March 29,

2018. (ECF 38-1 at p.1). The parties agreed to bring the claim before arbitrator,

James T. Carney, for a one-day hearing which was held on April 24, 2019.  (ECF

No. 38-35).

## II.

To prove a laches objection, one must show there was an unreasonable delay

by plaintiff and prejudice to the defendant.  *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th

209, 220 (3d Cir. 2021).  Since no party petitioned to vacate or confirm the

Arbitrator's finding that the Fund unreasonably delayed in pursuing the withdrawal liability, those facts are not described herein.  Suffice it to say, with regard to unreasonable delay, the Arbitrator found that

> the failure to devote sufficient resources to determine the existence of withdrawal liability does not excuse the Fund's inaction in this case or make its delay reasonable.

*See*, Opinion 1 at p. 66; *See also*, Opinion 2 at p. 52.  The facts regarding the prejudice factor are recounted below; and these facts focus on the testimony of Robert Smith, President of Allied, and the opinions of the Arbitrator concerning the prejudice factor of the laches objection.  Prior to reviewing Smith's testimony and the Arbitrator's findings, the record provided by the parties is described.

The parties submitted a joint exhibit binder to the arbitrator. (ECF No. 38-35, Tr. 5:14-21)[2]. The Arbitrator stated that exhibits 1 through 27 were admitted by agreement. (Tr. 180:13-24).  Despite the alleged agreement, the parties disputed whether the admitted Collective Bargaining Agreement ("CBA") (Exhibit 16) was authenticated when admitted into evidence.  Exhibit 16 is the CBA between District Council No. 711 International Union of Painters and Allied Trades State of New Jersey ("Union") and the employers: Garden State Council Painting and Decorating Contractors of America ("Council"), The New Jersey Glass and Metal

---

[2]    The transcript of the arbitration hearing is docket entry No. 38-35. As such, only the transcript cite is referred to herein.

Contractors Association (the "Association"), and The Drywall and Interior Systems Contractors Association, Inc. of New Jersey ("DISCA") with a term commencing on May 1, 2000 and terminating on April 30, 2006. (ECF 38-16). From a review of the record submitted at the arbitration hearing, there is no evidence whether Allied was a member of any of the associations representing the employers.   In addition, neither the Fund nor Allied is a signator to the CBA, so the authenticity of Exhibit 16 as a binding agreement was not examined or dismissed by the Arbitrator.

The Fund alleges Exhibit 15 shows Allied's consent to the CBA.  It is a two-page document.   The first page to the exhibit contains a signature page to an Agreement dated November 30, 2001 wherein the parties (Allied and District Council No. 711  agreed to "set forth control and regulate the wages, hours, fringe benefits, terms and conditions of employment under which the employer will employ painter, tapers, glazers and Allied trades." (ECF 38-15).  Additionally, the parties agreed that at the beginning of each contract year or upon beginning work with the territory (which was not specified) during the contract year, the employer will pay the Joint Trade Board $50.00.  It contains the signatures of Robert Smith (owner of Allied) as "employer," and Patrick Brennan for the Union and is dated November 30, 2001. *Id.*  Exhibit 15 contains a second page outlining rates, including pension rates; but it does not indicate any agreement by Smith to the

terms of the CBA (Exhibit 16), and Exhibit 15 has a term of one year. Exhibit 15 was labeled by the Fund as the signature page of the CBA, but there is no reference made within Exbibit 15 that Smith signed it to confirm Allied agreed to the terms of the CBA.  Confusingly, the alleged CBA signature page was signed more than a year after the effective date of the CBA (Exhibit 16), so there is no temporal connection between Exhibits 15 and 16.

In addition to the above issue, Binder No. 5 of the joint binders given to the Arbitrator in advance of the hearing included the deposition transcripts of Vicki McGlone, James Bogart, Kent Cprek and Robert Smith. (ECF No. 61-1 at p. 2). The depositions were submitted to the Arbitrator prior to the arbitration hearing as background materials. (Tr. 7:1-13).  Counsel for the Fund acknowledged the limited purpose for submitting the depositions as follows: "They were provided to you yesterday or the day before, I believe, for your review just to enable you to capture the full picture. But I believe that's how you viewed those documents." (Tr. 11:23- 12:4). At the outset of the arbitration hearing, the Arbitrator indicated that except for McClone's deposition, only the testimony at trial would be considered. "I went through briefly the depositions of the other witnesses, but I'm not -- I didn't make notes on them. I accept that they will testify and I will use only what they testify on the record today, except if you would choose to use portions of the deposition.  . . . I did it simply to try to get a good feel for what seems to be going

on in this case.".  (Tr. 6:18 - 7:13). The parties and the Arbitrator agreed that "Ms. McGlone's testimony can come in as substantive evidence, as if she were here testifying today." ( Tr. 11:7-16).  Based on the Arbitrator's direction, the Court only reviewed the testimony of the arbitration hearing.

 Robert Smith's testimony is summarized below.

 Robert Smith, as President of Allied, testified at the Arbitration hearing that Allied possesses no business records from the early 2000s (Tr. 352: 9-15). Smith explained that Allied does not possess any contribution records, correspondence with the union, and the terminating agreement. *(*Tr. 352; 13-22).  Allied has a "regular protocol of . . . every five years or so, purging our records." (Tr. 353:4-11).  Smith testified that it has been about 15 years from the termination of the alleged CBA in 2004 or 2005 and that "those records are probably destroyed." (Tr. 353; 9-12).  Smith explained Allied's record destruction policy. The protocol to destroy records occurred over a period of years.  (Tr. 385:11-15).  Smith testified:

> A.  (Smith) So we've developed policies over the course of years that have caught up to trends and recommendations. The Society for Human Resources recommends four years. Our accounting firm recommends six years. We've erred on the side of safety and went with five years.
>
> Q.  (Gelman, Attorney for the Fund) Okay.
>
> A.  So that evolution happened sometime in the last five or so years. So, five years ago in 2014, we would

have destroyed 2005, 2006,  2007 records. Maybe not
2010, we'd destroy them, but in 2014, we probably did.

 (Tr. 385:3-15). Smith was questioned about when the policy began. He stated:

> Q.    (Gelman) What would have triggered their
> destruction? APD closed shop –
>
> A.    (Smith) As I explained –
>
> Q.    -- they were in the rear-view mirror. You were
> moving along. ACM is a thriving company. And one day
> you said –
>
> A.    We gained knowledge. As we evolved and
> understood things a little bit better, and what we were
> required to do, and government requirements changing as
> they do, we came to the conclusion that every five years
> we should purge our records. Because, as I said, 30
> years' worth of records –
>
> THE ARBITRATOR: But you can't tell when that policy
> began?
>
> A.:    (Smith) I can't tell when that policy kicked in, but
> it was within the last five or so years.

(Tr. 386:9 – 387:2).  Smith was also questioned about years when the records were

destroyed.  To that query, Smith estimated the "probable year" of destruction.

Smith testified:

> A.    (Smith) They existed at one time.
>
> Q.    (Gelman) Okay. Why don't they exist anymore?
>
> A.    We believe we terminated the agreement sometime
> in 2004 or '05, in   that time '06 range. And we follow a
> regular protocol of you know, every   five years or so

> purging our records.  It's been 15 years. 14 years since
> that    happened and I'm certain that those records are
> probably destroyed.

(Tr. 353: 1-11).  On cross-examination, the Fund's attorney questioned Smith

about the reliability of the remittance reports as proof of the amount of withdrawal

liability and that the destruction of Allied's payroll reports was inconsequential

(Tr. 368:18 – 383:15). Smith would not confirm or deny the remittance reports

were accurate "because of the way the Fund has managed its fund." (Tr. 372: 8-

10). This statement refers to the lackadaisical manner in which the Fund

investigated withdrawal liability claims. Smith furthered that Allied had no

documents to verify the Fund's calculation. Smith stated:

> Because if I were to dispute each one of those hours or
> how the Fund calculated it, I wouldn't have the ability to
> do so based on the information that I had, because I
> purged my records.

(Tr. 373:20-24).  After some argumentative questioning, the Arbitrator

stepped in and summed up Smith's point:

> ARBITRATOR: I think that what he [Smith] is saying,
> very simply, is that since his records of the contributions,
> remittance reports, and everything else is gone, he has no
> way to verify your [the Fund's] records.

(Tr. 374:14-19).  From a review of the record, there was no other testimony

contrary to Smith's recollection concerning the destruction of Allied's records.

During the hearing, there was a colloquy among the Arbitrator and the attorneys clarifying the content of the remittance forms.  The Fund relied on the remittance forms to confirm the existence of the CBA:

> THE ARBITRATOR: Which suggests that these are back payments.
>
> MR. GELMAN: Pardon me?
>
> THE ARBITRATOR: If they're submitting money for a period in which they're showing no work --
>
> MR. GELMAN: But they weren't submitting money. These were -- remittances were zero.
>
> THE ARBITRATOR: Okay. Excuse me. These were reports showing no money --
>
> MR. BEGG: Correct.
>
> MR. GELMAN: Correct.
>
> THE ARBITRATOR: Okay. I'm with you.
>
> MR. GELMAN: Which we would argue is an acknowledgment of a contractual obligation. Otherwise, why submit them? Why submit zeros?
>
> THE ARBITRATOR: But they didn't keep doing it through the end of the contract?
>
> MR. GELMAN: They did.
>
> THE ARBITRATOR: Through --
>
> MR. GELMAN: Through the middle of 2006 roughly.
>
> THE ARBITRATOR: Okay.

MR. GELMAN: Right. So they had about a year of a runoff from when it appears as though, you know, assuming that their remittances were correct, where they stopped working but continued to submit monthly reports in no amount, for zero.

THE ARBITRATOR: So you're arguing the fact simply reflects a recognition by them that they were, although they may not be working under the agreement or having work performed under the agreement, that they had an obligation to tell you that.

MR. GELMAN: And it was recognizing their obligation that they were a party to the contract and that their obligations continued. If they didn't have an obligation to submit remittances, then they wouldn't.

(Tr. 40:8 - 42:6).

It appears that Gelman argues that the remittance forms are circumstantial evidence of a CBA obligation of Allied.  The Arbitrator never dismissed or accepted this circumstantial evidence in his opinions.  According to Smith, an adverse financial consequence occurred as a result of the notification of withdrawal liability.  Smith testified:

Q.     And have you and your company been impacted as a result of this litigation in the time that's passed?

A.     Significantly.

Q.     How?

A.     Well, in a number of ways.  Since we were notified in 2017, we had to report it on our financial reports.  During the normal course of our business we have a bank line of credit that we use to help us with our working capital, and our bank -- because it is a contingent liability on our financial reports -- has set aside or carved out that piece as an availability in our working capital, the –

ARBITRATOR: You no longer have that line of credit?

WITNESS:  I had a line of credit, but I don't the level and that availability that I had.

ARBITRATOR: No, I'm saying now.

WITNESS:  It's affected my credit with the bank. The carry cost of our legal costs, as well as the $71,000 that we were forced to pay out of the blue. So it's affected my ability to bond projects, it's affected my ability to borrow money, which has affected my ability to move the business forward.

(Tr. 353:12 - 354:18).

On the other hand, the Arbitrator minimized Smith's testimony and found that Allied was not prejudiced by the unreasonable delay of the Fund.  Within Opinions 1 and 2[3], the Arbitrator initiates his fact finding by applying the Third Circuit standard for determining prejudice.

> In *United States Fire Insurance Company v. Asbestos Spray, Inc.* (182 F.3d. 201, 208 (3d Cir. 1999) the Third Circuit reiterated the normal rule for determining prejudice: "To establish prejudice the party raising laches must demonstrate that the delay caused a disadvantage in asserting or establishing a claimed right or defense; the mere loss of what one would otherwise have kept does not establish prejudice."

(Opinion 1, p. 63; *See also* Opinion 2, p. 49).

---

[3]     See Footnote 1.

Within Opinion 1 and Opinion 2, the Arbitrator found that "Allied was not prejudiced by reason of its loss of records" for several reasons. First, the Arbitrator noted that the loss of an agreement with the Union to terminate the Collective Bargaining Agreement was not prejudicial to Allied because

> assessed withdrawal liability on the <u>assumption</u> the date upon which the withdrawal occurred was on the last date for which contributions were made. Had the Fund contended that the withdrawal of Allied occurred in 2006 instead of 2005, the arbitrator might well have concluded that with respect to the claim of a 2006 withdrawal, <u>the Fund did not proceed "as soon as practicable" and that Allied was prejudiced because its records of union agreements had been destroyed</u> . . . (Opinion 1, p. 67) (emphasis added).

Second, the Arbitrator found that the "probable" loss of its payroll records was not prejudicial "because the Fund has microfiche of Allied's remittance reports which is sufficient to measure withdrawal liability," and there was no "diligent search" by Allied to warrant prejudice. (Opinion 1, p. 67; *see also* Opinion 2, p. 53). The Arbitrator furthered:

> There are two faults in this claim. First, the testimony indicates that while Allied believes that the records were "probably destroyed" it had not made any check to verify this probability." (Tr. 353). Laches due to loss of records can only be found if the party so claiming has made a <u>diligent search for the missing records and as a result of such investigation has determined that the records no longer exist</u>. Second, since the determination of number of contribution units is based on Allied's own remittance forms, it is difficult to see how per se Allied is prejudiced by the loss of the records which it used to make up the

> remittance reports given the availability of such reports. Speculation that the Fund has forged the remittance reports or some Allied employee had sent in inaccurate reports is just that - speculation. Delay is not prejudicial 'where the alleged harm was 'entirely hypothetical." *Meyers v. Asics Corp*., 974 F.2d 1304, 1308 (Fed. Cir. 1992).

(Opinion 1, p. 67-68; *see also* Opinion 2, p. 53-54).  Third, the Arbitrator found that Allied benefitted from the delay for economic reasons. The Arbitrator penned:

> Looking at it another way, Allied has the use, interest free, of money which it might otherwise have had to pay to the Fund. *See Brentwood Financial Corporation v. Western Conference of Teamsters Pension Trust Fund*, 902 F. 2d. 1456, 1459-20 (9th Cir. 1990); *Board of Trustees of Trucking  Employees of North Jersey Welfare Fund Inc. v. Canny*, 900 F. Supp. 583, 594-5 (N. D. N.Y. 2995)

(Opinion 1, p. 69; Opinion 2, p. 42). The Arbitrator does not cite to any testimony to support this conclusion.

In Opinion 5, the Arbitrator utilized a different standard for showing prejudice. The Arbitrator wrote:

> undue delay was not sufficient to vacate an assessment of withdrawal liability; rather the delay must be so prejudicial as to deprive the employer of a reasonable chance of contesting the assessment.

(Opinion 5, p. 30).  The Arbitrator changed directions again and revised the standard as one where "the undue delay by the Fund did not so prejudice Allied as to make any assessment unfair per se."  *Id.*

In Opinion 4, the Arbitrator offered yet another standard for showing prejudice. (Opinion 4, p. 34). It reads:

> Now to prove prejudice by reason of delay, the employer must prove three things: (1) that the delay has resulted in the unavailability of witnesses and documents which would have been available but for the delay; (2) that the unavailable witnesses or documents would have provided or constituted relevant evidence on the merits of the parties' claims and (3) that the lack of such evidence precludes a party from prevailing on the merits of its claim with the result that it suffers financial detriment.

This standard has no supporting citation. Later in Opinion 4, the Arbitrator alters the "diligent search" requirement, as noted in Opinions 1 and 2, to a "comprehensive search." This change is not supported by a citation. The Arbitrator writes:

> One defect in this claim is Allied has failed to prove that it made a comprehensive search of its records and did not find any records of its contract with the union.

(Opinion 4, p. 36). In addition, the Arbitrator recognizes that the CBA "may or may not have been signed by Allied . . ." (Opinion 4, p. 37). This assertion is different from the Arbitrator's findings in Opinions 1 and 2. *Compare*, Opinion 1 at p. 58-59 and Opinion 2 at p. 44-45 (wherein the Arbitrator affirmed that there was a CBA), with Opinion 4 at p. 37 (wherein the Arbitrator recognizes that Allied may not have signed the alleged CBA). The Arbitrator, minimizing the disparity

in the testimony, refers back to his lack of prejudice conclusion.  The Arbitrator

concluded:

> However, what throws this issue into doubt is Mr.
> Smith's testimony that he believed that he and the union
> terminated the contract in 2005 and 2005 but the absence
> of Allied's collective bargaining agreement records
> precluded him from producing documents evidencing
> that date that the obligation to contribute ceased.
> Assuming that he made diligent search for such records
> (and the record is not totally clear on this point) and
> could not locate them, Allied has a potential claim of
> prejudice if the assessment of withdrawal liability is
> made as of April 2006 instead of April 2005. However,
> there was a suggestion at the trial that use of the later
> date for cessation of the obligation to contribute might
> actually benefit Allied because of improvement in the
> finances of the Fund. If such is the case, then Allied
> cannot be prejudiced by inability to prove an earlier
> withdrawal date if such earlier date would have resulted
> in the assessment of a greater withdrawal liability than
> the later date.

(Opinion 4, p. 37).

## III.

Withdrawal liability is a statutorily created liability wherein an employer is

responsible for its allocable share of unfunded vested benefits after withdrawing

from a plan.  29 U.S.C. § 1381(b), 1391(a). This case revolves around the statute of

limitations when withdrawal liability arises; and if that date is prolonged, the

statutory language of "as soon as practicable" engenders a laches objection.  This

section provides the statutory background and the case law guiding this

Memorandum.

Congress amended ERISA by enacting the Multiemployer Pension Plan Amendment Act of 1980 (MPPAA).   29 U.S.C. § 1381 *et seq*.  Under the MPPAA, an employer is liable for any "unfunded vested benefits" after withdrawing from a plan.  29 U.S.C. § 1391(a). Unfunded vested benefits are "calculated as the difference between the present value of vested benefits and the current value of the plan's assets."  *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 316 (3d Cir. 2011) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984)).  This is known as "withdrawal liability."  19 U.S.C. § 1381(a).  It is a statutorily created liability wherein an employer is responsible for its allocable share of withdrawal liability.  29 U.S.C. § 1381(b).

The legislative intent of the MPPAA was "to protect the financial solvency of multiemployer pension plans."  *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp.,* 522 U.S. 192*,* 196 (1997).  Under the MPPAA, "employers who withdraw from underfunded multiemployer pension plans [must] pay a withdrawal liability."  *Id*. at 196.  When an employer withdraws, the employer must pay his "proportionate share of the plan's unfunded vested benefits."  *Id*. (quoting *R.A. Gray & Co*., 467 U.S. at 725).  Employer payments may be tendered over a period of 20 years.  *Id.* at 197.  The MPPAA "places the calculation burden on the plan's trustees."  *Id*.  The trustees must demand withdrawal penalties "as

soon as practicable" after the employer's withdrawal.  29 U.S.C. § 1451(f). After

receipt of notice of withdrawal liability, the employer may invoke a dispute

resolution procedure. 29 U.S.C. §§ 1401(a)(1)[4].   Suits enforcing MPPAA rights

must be filed within six years after the date on which the cause of action arose. 29

U.S.C. § 1451(f)(1); *Bay Area*, 522 U.S. at 198.

In 1997, the Supreme Court addressed the question of when the six-year

limitation of action period under MPPAA commences.  *Id*. at 205.  In *Bay Area*,

Ferbar owned three laundries prior to 1990. *Id.*at 198. For several years, Ferbar

contributed to the Bay Area Laundry and Dry Cleaning Pension Fund (Pension

Fund) on behalf of employees at all three facilities. *Id.* In 1983, Ferbar ceased

contributions for one of the laundries; and the company ceased contributions for

the other two facilities in March 1985. *Id.* "Ferbar never resumed participation in

the Pension Fund." *Id.* In December, 1986, the Pension Fund forwarded notice to

Ferbar demanding payment of its withdrawal liability either in its entirety or in

monthly payments beginning on February 1, 1987. *Id.* On July 8, 1987, Ferbar

filed a notice of initiation of arbitration.  *Id.* Despite said notice, arbitration

proceedings were not commenced. *Id.*  The Pension Fund delayed initiating suit

until February 9, 1993. *Id.* at 199.  Justice Ginsburg noted "the complaint was filed

---

[4]      The dispute resolution procedure entails that once notice is received, an employer has
ninety (90) days to request review of the demand, and an additional one hundred and twenty
(120) days to request arbitration.

nearly eight years after Ferbar completely withdrew from the Pension Fund in March 1985, six years and eight days after Ferbar missed its first scheduled payment on February 1, 1987 . . ." *Id.* The Supreme Court held that the MPPAA does not provide a pension plan with any claim of relief against an employer on the date of withdrawal, but focused on two other subsequent events that would trigger the limitations period for a withdrawal liability claim:

> The plan's interest in receiving withdrawal liability does not ripen into a cause of action triggering the limitations period until (a) the trustees calculate the debt, sets the schedule of installments, and demands payment pursuant to 29 U.S.C.S. § 1399(b)(1); and (b) the employer defaults on an installment due and payable under the trustees' schedule.

*Id*. at 202.  In adopting the *Bay Area* holding, the Supreme Court understood it delayed the triggering date for a lengthy period of time, so within the decision, Justice Ginsberg responded to some critics of its analysis.  One opposing argument was that the triggering date would improperly place the running of the limitations period in control of the plan sponsor by "pegging the statute [of limitations] to the schedule set by the plan's trustees."  *Id*. at 204.   In response, Justice Ginsberg noted that Congress did not precisely fix a time in which a fund must calculate the employer's withdrawal liability, so to accommodate the Congressional objective, the time period must be flexible. Justice Ginsburg wrote:

> Congress' adoption of a looser "as soon as practicable" requirement for the initial determination of withdrawal liability bespeaks a deliberate legislative choice to afford some flexibility in gathering the information and performing the complex calculations necessary to make that assessment.

*Id*. at 205.  Furthermore, the Court discounted the practical adverse impact of the plan sponsor controlling the limitations period because there are "significant incentives . . . [which] will, in the usual case, induce plan sponsors to act promptly to calculate, schedule, and demand payment of withdrawal liability." *Id*. at 205 (quoting *Joyce v. Clyde Sandoz Masonry*, 871 F.2d 1119, 1126 (D.C. Cir., 1989).

Justice Ginsberg noted that since plan sponsors "have a financial imperative to act quickly for the contributions lost when an employer withdraws will not be replaced with withdrawal liability payments until the plan calculates those payments and serves a demand on the employer. And, as time passes, the likelihood that the plan will not receive payment increases." *Id.* at 205.  Justice Ginsberg reasoned that such "a delay could constitute a breach of fiduciary duty actionable at the instance of the plan's beneficiaries." *Id*. at 205.   Thus,  leaving the limitation period in the hands of the plan's sponsor appears to be a manageable downside risk in light of the incentive to collect.  Attempting to box-in that risk, Justice Ginsberg noted an employer has some recourse under the statute, as it may assert that the plan sponsor has not complied with the "as soon as practicable" language in the MPPAA.

Justice Ginsberg stated:

> if an employer believes the trustees have failed to comply with their "as soon as practicable" responsibility, <u>the employer may assert that violation as a laches objection at an arbitration contesting the withdrawal liability assessment</u>.

*Id*. at 205 *(*emphasis added).

When the Supreme Court decided *Bay Area*, it focused on when the cause of action arises under MPPAA; but in the case at bar, there is another statutory exception (construction industry exception) which when coupled with the *Bay Area* holding muddies the waters more.

In the mid-1980s, withdrawal liability under the MPPAA was functioning poorly in the construction industry. This was due to the transient nature of the construction industry, and some unscrupulous actions by construction employers who would sporadically change corporate structures, leaving the prior corporate structure without funds, and plan sponsors without recourse to collect withdrawal liability from such employers. Congress amended the MPPAA to effectuate its goal of ensuring pension benefits for union construction workers.  This amendment is commonly known as the construction industry exception.  *Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Tr.*, 821 F.3d 1250, 1253-55 (10th Cir. 2016); *Stevens Eng'rs & Constructors, Inc. v. Local 17 Iron Workers Pension Fund*, 877 F.3d 663, 670 (6th Cir. 2017).

22

The construction industry exception imposes withdrawal liability on a construction industry employer who ceases to have an obligation to contribute under a plan, "but resumes such work within five years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption." 29 U.S.C. § 1383(b)(2).  In addition, the amendment broadened the definition of an employer to include one that reorganized its corporate entity but remained in control of the same individuals who conducted operations in the same jurisdiction. 29 U.S.C. § 1383(b)(1). Applying the construction industry exception, the limitation period became more fluid. That is, the *Bay Area* rationale plus the construction industry exception together may extend the limitations of actions period substantially further.

    Applying this standard to the case at bar, Allied allegedly withdrew in 2005 and resumed work in approximately 2007.  (Tr. 350:14-20). The Fund knew of Allied's obligation by October 2011 but never notified Allied of its obligation to pay withdrawal liability until July 20, 2017, which included a Withdrawal Liability Worksheet noting Allied defaulted on July 31, 2005. (Allied SOMF 2(b), ECF 36). Yet, the Fund was still able to (legitimately yet unsuccessfully) argue under *Bay Area* and the construction industry exception, that it timely noticed Allied– despite it being more than 10 years after the Fund's cited withdrawal date.

IV.

In reviewing an arbitrator's award of withdrawal liability, a district court must "presume[] that the arbitrator's factual findings are correct unless they are rebutted by a clear preponderance of the evidence.  Legal conclusions are reviewed *de novo*." *Crown Cork & Seal Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 982 F.2d 857, 860 (3d Cir. 1992) (citations omitted). "A factual finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *See United States v. Murray*, 821 F.3d 386, 391 (3d Cir.), cert. denied, —— U.S. ——, 137 S.Ct. 244 (2016) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985). Generally, a "motion to confirm or vacate an arbitration award [is] not intended to involve complex factual determinations, other than a determination of limited statutory conditions for confirmation or grounds for refusal to confirm." *PG Publishing,* 19 F. 4th at 314 (quoting *Teamsters Local 117 v. United Parcel Serv.* 966 F. 3d 245, 248-50 (3d Cir. 2020).

"There is a strong presumption under the [FAA] in favor of enforcing arbitration awards." *Brentwood Med. Assoc. v. United Mine Workers*, 396 F.3d

237, 241 (3d Cir.2005). Therefore, "an award is presumed valid unless it is affirmatively shown to be otherwise, and the validity of an award is subject to attack only on those grounds listed in [Section 10 of the FAA]." *Id.*

The Arbitrator's determination of denial of the laches affirmative defense to Allied presents a mixed question of law and fact. Therefore, the Court will review the Arbitrator's interpretations within that determination *de novo* but will apply a "clearly erroneous" standard to the Arbitrator's application of that legal standard to the facts to reach his findings of fact. *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F. Supp. 3d 365 (D.N.J. 2018) (citing *Crown Cork & Seal Co.*, 982 F.2d at 861; *N.Y. Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund*, 303 F.Supp.3d 236 at 247-48, 255 (S.D.N.Y. 2018)).

## V.

Laches is an objection to liability because of the staleness of a claim. *Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1258-59 (3d Cir.1974) "Laches conceptualizes the inequity which may inhere when a stale claim is permitted to be enforced". *Id.* The purpose of laches is to avoid inequity. *In re Bressman*, 874 F.3d 142, 149 (3d Cir. 2017). The Supreme Court found that laches does not apply when there is "no excusable delay in seeking a remedy and where no prejudice to the defendant has ensued from the mere passage of time . . ." *Gardner v. Panama R. Co.*, 342 U.S. 29, 30-31, (1951), wherein the Court states:

> Though the existence of laches is a question primarily
> addressed to the discretion of the trial court, the matter
> should not be determined merely by a reference to and a
> mechanical application of the statute of limitations. The
> equities of the parties must be considered as well. Where
> there has been no inexcusable delay in seeking a remedy
> and where no prejudice to the defendant has ensued from
> the mere passage of time, there should be no bar to relief.
> *The Key City*, 1872, 14 Wall. 653, 20 L.Ed. 896;
> *Southern Pacific Co. v. Bogert*, 1919, 250 U.S. 483, 39
> S.Ct. 533, 63 L.Ed. 1099; *Holmberg v. Armbrecht*, 1946,
> 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743; see *McGrath
> v. Panama R. Co*., 5 Cir., 1924, 298 F. 303, 304.

At common law, when laches was applied, the burden of proof was upon defendant

to show both the unreasonable delay by plaintiff and the prejudice suffered by

defendant.  In some recent cases, the burden of proof shifts to plaintiff to show that

defendant did not suffer any prejudice. For instance, the Third Circuit shifted the

burden to disprove prejudice where the claim arises under a federal statute without

a statute of limitations, but the analogous state statute of limitations has expired.

*Kars 4 Kids Inc. v. Am. Can!*, 8 F. 4t 209 n.3 (3d Cir. 2021) (citing *Santana*

*Products, Inc. v. Brobrick Washington Equipment, Inc.*, 401 F. 3d 123, 138-39 (3d

Cir. 2005). The underlying rationale for shifting the burden of proof onto the

plaintiff is that the courts presume prejudice when there is an unreasonable delay

and the statute of limitations has expired.  In this case, *Bay Area* makes it clear that

the statute of limitations does not commence to run until notification of withdrawal

liability (July 2017), and since the statute of limitations has not expired, the

presumption does not shift under the *Kars 4 Kids* rationale.  *Santana*, 401 F. 3d at 138-39 (3d Cir. 2005).  It is unclear whether this presumption of prejudice should apply here because the statute of limitations has not expired. S*ee also Travers v. FedEx Corporation*, 567 F. Supp. 3d 542 (E.D. Pa. 2021). *See, e.g., Gruca v. U.S. Steel Corp*., 495 F.2d 1252, 1258–59 (3d Cir. 1974); citing *Stevens v. Tennessee Valley Authority*, 712 F.2d 1047, 1056 (6th Cir.1983);  *Gall v. U.S. Steel Corp*., 598 F. Supp. 769, 773 (W.D. Pa. 1984).  In light of same, and under the circumstances, the Court imposes that the defendant must prove both unreasonable delay and prejudice.

Thus, laches is an equitable defense, and the standard arose from considering exactly what harm was caused to the defendant by the passage of time. *Gardner*, 342 U.S. at 30-31. "Laches bars an action from proceeding if there was (1) an inexcusable delay in bringing suit, and (2) material prejudice to the defendant as a result of the delay." *Joint Stock Soc. v. UDV N. Am., Inc*., 266 F.3d 164, 185 n. 12 (3d Cir.2001) (citing *Pappan Enter. v. Hardee's Food Sys*., 143 F.3d 800, 804 (3d Cir.1998)).

Therefore, consistent with the equitable intent of laches, the standard set forth above, and in *United States Fire Insurance Company v. Asbestos Spray, Inc*., the inquiry for prejudice is whether the loss of documents was caused by the delay and whether the loss materially (not simply allegedly) disadvantaged a defendant's

defense. *See Smith v. Caterpillar Co*., 338 F.3d 730, 733 (7th Cir. 2003). "Material prejudice may be defined as either evidentiary prejudice or economic prejudice. Evidentiary prejudice arises when the infringer cannot put on a fair defense because of the loss of records, death of witnesses, or the dimming of memories. Economic prejudice arises when an infringer suffers the loss of monetary investments or incurs damages that would likely have been prevented by an earlier suit." *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co*., 679 F.Supp.2d 512, 520 (D.Del.2010). (citing *A.C. Aukerman Co. v. R.L. Chaides Const. Co*., 960 F.2d 1020, 1032 (Fed.Cir.1992).

The Third Circuit in *In re Lower Lake Erie Iron Ore Antitrust Litigation*, applying an analogous "material prejudice" laches standard cited from the Supreme Court of Ohio, assessed the prejudice prong of appellant B & LE's laches claim consistent with consideration of whether the delay caused a disadvantage in asserting or establishing a claimed right or defense:

> We need not determine whether the law of Ohio permits assertion of a laches defense to antitrust suits or whether the fraudulent concealment claims of the steel companies and Erie should have been submitted to the jury. "'Delay in asserting a right does not of itself constitute laches, and in order to successfully invoke the equitable doctrine of laches it must be shown that the person for whose benefit the doctrine will operate has been materially prejudiced by the delay of the person asserting his claim.' " *Emrick v. Multicon Builders, Inc*., 57 Ohio St.3d 107, 566 N.E.2d 1189, 1194 (1991), quoting *Smith v. Smith*, 168 Ohio St. 447, 156 N.E.2d 113, 119–20 (1959).

> The district court found that B & LE had not shown any significant prejudice attributable to the delay. Unless clearly erroneous, we will not disturb that finding. B & LE contends that it was prejudiced by the death of many critical witnesses and the loss of numerous documents; B & LE, however, details neither the substance of these witnesses' testimony nor the content of lost documents and what they would have revealed concerning its defense against the conspiracy. Given the number of witnesses and documents which were admitted in evidence, it is difficult to see how B & LE was prejudiced by the lack of either of those two components of evidence. We therefore conclude that laches is not a bar to the Valentine Act claims.

*In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144, 1174 (3d Cir.1993).

Here, Allied differs from B & LE in that Allied's destroyed documents were not only identified and testified as to having existed at one point, but also clearly relevant to Allied's ability to dispute liability and damages. For example, the disputed CBA (Exhibit 16) is necessary to confirm the date on which Allied's obligation to contribute began and ended as well as what constituted "covered work." Remittance reports may confirm or dispute the Fund's calculations; but Allied's payroll records would allow Allied to confirm the accuracy of the remittance reports.  That is, Allied's project records would confirm or dispute whether Allied resumed "covered work" within five years and the extent of same. In addition, Mr. Smith alluded to a termination agreement being signed in 2004 which may be a critical part of any liability.

Further Smith testified before the Arbitrator as to the institution of its document retention policy and that the papers were destroyed in 2014, three years after Allied undisputedly appeared on the Fund's internal list of employers to investigate for withdrawal liability in 2011. (Tr. 385:3-15).

## VI.

An arbitrator's decision may be vacated under the following standards per the Federal Arbitration Act (9 U.S.C.A. § 10):

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

"Evident partiality," under § 10(a)(2) entails "the challenging party … show[ing] 'a reasonable person would have to conclude that the arbitrator was partial' to the other party to the arbitration." *Kaplan v. First Options of Chi., Inc*., 19 F.3d 1503, 1523 n. 30 (3d Cir.1994) (quoting *Apperson v. Fleet Carrier Corp*., 879 F.2d 1344, 1358 (6th Cir.1989)). "Bias in refusing to consider certain evidence

could result in an unfair hearing, and so, pursuant to § 10(a)(3), 'a district court

may vacate an award if a party to an arbitration proceeding has not been given

notice and opportunity to present arguments and evidence on the merits of the

dispute.'" *Andorra Services Inc. v. Venfleet, Ltd*., 355 F. App'x 622, 628 (3d Cir.

2009) (quoting *Teamsters Local 312 v. Matlack, Inc*., 118 F.3d 985, 995 (3d

Cir.1997).

In consideration of the meaning of "misconduct . . .  in refusing to hear

evidence pertinent and material to the controversy" under Federal Arbitration Act,

9 U.S.C.A. § 10(a)(3), the Third Circuit has "long held that for an error to justify

vacating an arbitration award, it must be 'not simply an error of law, but [one]

which so affects the rights of a party that it may be said that he was deprived of a

fair hearing." *Whitehead v. Pullman Grp., LLC*, 811 F.3d 116, 120 (3d Cir. 2016).

Further, vacating an award is appropriate in light of "procedural irregularities so

prejudicial that they result in 'fundamental unfairness." *Id*. (quoting *Teamsters

Local 312 v. Matlack, Inc.*, 118 F.3d 985, 995 (3d Cir. 1997)).

Based on the above standards, the Arbitrator's award is vacated for several

reasons.

Reason 1:

In Opinions 1 and 2, the Arbitrator finds that Allied was not prejudiced by

the unreasonable delay based on three facts. One of the Arbitrator's factors was

that the unreasonable delay economically benefitted Allied as "Allied had the use, interest free, of money it might otherwise had to pay the Fund".

(Opinion 1, 67-68; Opinion 2, p. 53-54). This economic benefit for finding no prejudice does not comport with the case law. The Arbitrator does not cite to any witnesses' testimony to support the purported economic benefit.  The standard for finding prejudice is:

> the party asserting laches as a defensive bar must establish (1) an inexcusable delay in bringing the action and (2) prejudice. *EEOC v. Great Atlantic & Pacific Tea Co.,* 735 F.2d 69, 81 (3d Cir.1984); *Churma v. United States Steel Corp*., 514 F.2d 589, 593 (3d Cir.1975). To establish prejudice, the party raising laches must demonstrate that the delay caused a disadvantage in asserting and establishing a claimed right or defense; the mere loss of what one would have otherwise kept does not establish prejudice. *In re Bohart*, 743 F.2d 313, 327 (5th Cir. 1984) (reversing district court's dismissal of interpleader based on laches).

*United States Fire Insurance Company v. Asbestos Spray, Inc*. 182 F.3d. 201, 208 (3rd. Cir. 1999).

Within the above standard, there is no mention of economic benefit to the employer as a means to mitigate the prejudice factor of laches. In reviewing this legal conclusion *de novo* it is contrary to case law. *Crown Cork & Seal Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 982 F.2d 857, 860 (3d Cir. 1992) (citations omitted).

Moreover, the Arbitrator found this economic benefit without citing to any testimony and without analyzing Allied's adverse financial consequence as asserted by Mr. Smith. Smith testified that the notice of withdrawal liability impacted Allied's "bank line of credit" by limiting its availability and reduced the amount of credit. (Tr. 353:12 - 354:18).

In sum, to consider an economic benefit as a means to mitigate prejudice does not comport with the case law. Assuming it is a factor, which it is not, failing to consider Allied's adverse economic consequence in the Arbitrator's factual findings is a clearly erroneous finding of fact. *United States v. Murray*, 821 F.3d 386, 391 (3d Cir.), cert. denied, —— U.S. ——, 137 S.Ct. 244 (2016) (quoting *United States v. U.S. Gypsum Co*., 333 U.S. 364, 395 (1948)).

Reason 2:

In determining the year of withdrawal from the Fund by Allied, the commencement of the five-year period under the construction industry exception, the Arbitrator assumed that it occurred in 2005 rather than 2006. The Arbitrator adopted this assumption in order to avoid a finding of prejudice. The Arbitrator wrote:

> assessed withdrawal liability on the <u>assumption</u> the date upon which the withdrawal occurred was on the last date for which contributions were made. Had the Fund contended that the withdrawal of Allied occurred in 2006 instead of 2005, the arbitrator might well have concluded that with respect to the claim of a 2006 withdrawal, <u>the Fund did not proceed "as soon as practicable" and that Allied was</u>

33

> prejudiced because its records of union agreements had been
> destroyed . . . (Opinion 1, p. 67) (emphasis added).

In order to find prejudice, one must find that the delay "caused a disadvantage in asserting or establishing a claimed right or defense". The standard for imposing laches does not suggest that the Arbitrator may avoid a finding of prejudice by "assuming" facts. Moreover, the Arbitrator's "assumed" the year of withdrawal; but this does not account for the scope of the destroyed records that may have "established [other]claimed rights or defenses." *See*, *United States Fire Ins.*, 182 F. 3d at 208. In short, the Arbitrator based a denial of an assumed date rather than a disadvantage in asserting a defense. For example, Mr. Smith testified that there was a termination letter that was destroyed which placed Allied at a disadvantage in asserting a defense. The Arbitrator's assumption does not cure the disadvantage of production of the termination agreement. (T. 352, 13-22).

The assumption of a fact to undermine a determination of prejudice is not supported by case law.

Reason 3:

In Opinion 1, the Arbitrator noted that prejudice cannot be found where the harm is "entirely hypothetical." More specifically, the Arbitrator wrote that "delay is not prejudicial 'where the alleged harm was entirely hypothetical'." (citing *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992). The *Meyers* case does not contain the "entirely hypothetical" language. *Meyers* states the following:

Defendants also argue that they suffered evidentiary prejudice - loss of key witnesses and loss of documentary evidence. However, none of the defendants state exactly what particular prejudice it suffered from the absence of these witnesses or evidence. Conclusory statements that there are missing witnesses, that witnesses' memories have lessened, and that there is missing documentary evidence, are not sufficient. *Meyers v. Asics Corp*., 974 F.2d 1304, 1308 (Fed.Cir.1992).

In this case, Smith testified that the records were destroyed in accordance with its procedures; and his recollection of the events would have been enhanced if those records were available. (Tr. 388:17 - 389:8). These are not conclusory statements but show that the long delay caused prejudice. The error is that the Arbitrator relied on the entirely hypothetical language that is not set forth in *Meyers*; and reading *Meyers* more closely supports an opposite finding. The use of this standard is contrary to case law.

Reason 4:

The Arbitrator continually relies on his finding that Allied failed to perform a "diligent search" for its records. Opinion 1, p. 67; Opinion 2, p. 53. The Arbitrator found there was neither a "diligent search" or a "comprehensive search" (Opinion 4, p. 36) because Smith at one juncture characterized that the records were "probably destroyed." (Opinion 1, p. 67-68; Opinion 2, p. 53-54; Opinion 4, p. 36.) To the Arbitrator, the use of the language "probably destroyed" was construed to mean Allied did not search for the relevant records. Reading Smith's testimony as a whole, that finding of fact is arbitrary. Smith is quite adamant that

all the records were destroyed pursuant to a company policy. Undoubtedly Smith said "probably" at one point (Tr. 359: 9-12); but the Arbitrator's interpretation is out of context with Smith's testimony as a whole. In addition, there was no other testimony contradicting Smith's testimony.  As such, this finding of fact is definitively and clearly against the evidence as a whole.

Reason 5:

The applicable case law on laches is set forth in *Gardner*, 342 U.S. at 30-31, *Asbestos Spray, Inc*. 182 F.3d. at 208 (3rd. Cir. 1999), and *Joint Stock Soc.*, 266 F.3d at 185 n. 12 (3d Cir.2001) (citing *Pappan Enter. v. Hardee's Food Sys*., 143 F.3d 800, 804 (3d Cir.1998)). These cases confirm the inquiry for prejudice is whether the loss of documents was caused by the delay and whether the loss materially (not simply allegedly) disadvantaged a defendant's defense. *See Smith v. Caterpillar* Co., 338 F.3d 730, 733 (7th Cir. 2003). Essentially, Allied needed to show: (a) attribution of the loss of its records to the delay; (b) identification of missing evidence; and (c) relevance of the evidence to the party's defense. *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144, 1174 (3d Cir.1993).

The Arbitrator does not employ this standard.  He not only incorporates a stricter standard, but, as noted, the standard is changed in his opinions.  At first, the Arbitrator found there was no prejudice because Allied had not performed a "diligent search" (Opinion 1, p. 67 and Opinion 2, p. 53).  At another point the

standard was changed to a "comprehensive search" (Opinion 4, p. 36). And finally, the standard morphed into "the undue delay by the Fund did not so prejudice Allied as to make any assessment unfair per se." (Opinion 5, p. 30).  In sum, these standards are different from the standards set forth by the Third Circuit.  As such, the standards the Arbitrator used to show no prejudice against Allied are not consistent with case law.

Reason 6

In the Arbitrator's opinions, he finds that Allied was bound by a CBA (Exhibit 16). For instance, in Opinion 1 and Opinion 2.  He writes:

> Allied Painting and Decorating Company ("Allied") was owned by Robert Smith who is also the owner of Allied Construction Management ("ACM") with the result that the two companies are part of the same controlled group and are therefore considered the same employer for the purpose of Multi-Employer Pension Plans Act ("MPPAA"). (Tr. 44) Allied signed a contract with the District Council 711 of the International Painters Union ("Union") which provided for Allied to use Union employees to do painting when working in the state of New Jersey and which required Allied to contribute to the International Painters & Allied Trades Industry Pension Fund ("Fund") for work performed by such Union employees. (Tr. 39) Allied ceased painting operations in New Jersey in 2005 with its last contributions to the Fund being made for April, 2005. (Tr. 14) Allied continued to submit monthly remittance reports to the Fund showing that it had utilized no Union employees until the expiration of the collective bargaining agreement on April 30, 2006 (Tr. 19) although there is some evidence that indicates that Allied had reached an agreement with the Union before that date to cancel its contract (Tr. 353). Such an agreement would have relieved Allied of its reporting obligation for any period following the cancellation.

(Opinion 1, p. 59). Notably, Opinion 2 restates the above paragraph, except where it states Allied submitted remittance forms until the expiration of the CBA in April 30, 2006. The Arbitrator only relies on the opening statement of the Counsel for the Fund (Tr. 19) which is not testimony, and also cites to the alleged signature page of Exhibit 15 which does not reference the CBA.  (Opinion 2, p. 44).

The Arbitrator does not analyze the admissibility of the CBA or weigh its merits.   The CBA is executed between an association of painting firms (but not by Allied) and District Council No. 711 (but not by the Fund). As such, the CBA is not a business document of either party, and it was not authenticated by a witness. The Fund argues that Allied signed onto the CBA through Exhibit 15, a two-page document. But Exhibit 15 does not state that it incorporates the terms of the CBA. To make his findings, the Arbitrator should have discussed these facts in his analysis.  To simply assert there is a CBA, without more explanation is arbitrary. As Smith testified, he discounted the Fund's records "because of the way the Fund has managed its fund," referring to the Fund's unreasonable delay and erratic work procedures.  (Tr. 372, 8-10).  It was arbitrary for the Arbitrator not to explain his rationale under the circumstances.

Conclusion

The cumulation of the above events amounts to a reasonable appearance of bias against Allied and results in deprivation of a fair hearing. Allied was at a

disadvantage by not having access to records, and accordingly, denied a defense given by: (a) the Arbitrator's application of inconsistent standards as to the prejudice prong of Allied's laches defense which increasingly challenged Allied's wherewithal to meet the stated burden; (b) acceptance of unauthenticated and challenged documents without any discussion of any crucial facts as whether the parties submitted the applicable CBA and accurate remittance reports (which were then relied upon by the Arbitrator to deny prejudice) and leaving Allied with no means to dispute the Fund's calculations; and (c) irregularities such as finding an avoidance of prejudice against Allied by assuming a 2005 withdrawal date; (d) by adopting an economic benefit prong to the laches objection in Opinion 1 when it is not in case law; and (e ) finding Smith's testimony to mean that there was no diligent search when Smith testified about any ongoing document retention protocol. The totality of the circumstances worked to effectively deny Allied a fair hearing, demanding vacating the award.

## **ORDER**

THIS MATTER having come before the Court on defendant's Motion for Judgment on the Pleadings (ECF No. 31) and Plaintiff's Motion for Summary Judgment (ECF No. 34); and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

IT IS on this 1st day of March, 2023,

ORDERED that for the foregoing reasons the Arbitrator's Final Award dated June 4, 2021 is vacated; and it is further;

ORDERED that the motions (ECF No. 31 and ECF No. 34)  are denied as moot as said motions are treated as cross motions to confirm or vacate the Award.


s/*Peter G. Sheridan*_____
PETER G. SHERIDAN, U.S.D.J.